UA LOCAL 343 OF the UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO; UA Local Nos. 159, 342, 343, and 444 Combined Pension Trust Fund; UA Local Nos. 159, 342, 343 and 444 Combined Health & Welfare Trust Fund; and UA Local No. 343 Journeyman and Apprentice Training Trust Fund, Plaintiffs–Appellees,

v.

NOR–CAL PLUMBING, INC.; Elmar Lee Pettit; North Bay Plumbing, Inc.; Audrey Jean Pettit, Defendants–Appellants.

No. 92–15749.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1992.

Decided Oct. 14, 1994.

As Amended Feb. 28, 1995.

John. M. Kelson, Oakland, CA, for defendants-appellants North Bay Plumbing, Inc. and Audrey Jean Pettit.

Mark R. Thierman, Thierman, Cook, Brown & Prager, San Francisco, CA, for defendants-appellants Nor–Cal Plumbing, Inc. and Elmar Lee Pettit.

John J. Davis, Jr., McCarthy, Johnson & Miller, San Francisco, CA, for plaintiffs-appellees.

Before: NORRIS, BEEZER, and KLEINFELD, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Appellant Elmar Lee Pettit is a plumbing contractor who, with appellant Audrey Pettit, his wife, owns both Nor–Cal Plumbing, Inc. and North Bay Plumbing, Inc. Nor–Cal is union, and North Bay is non-union. Appellees, Local 343 and the employee trust funds in which it participates, brought this action under Section 301 of the Labor Management Relations Act ("LMRA") and Section 502 of the Employee Retirement Income Security Act ("ERISA"), seeking damages for breach of the Nor–Cal collective bargaining agreement. The action is premised on the theory that the collective bargaining agreement between Local 343 and Nor–Cal covered North Bay as well because North Bay was the alter ego of Nor–Cal.

On the basis of "an undisputed record of fraud, deception and obstruction," the district court ruled on summary judgment that North Bay was the alter ego of Nor–Cal. Order Granting Summary Judgment at 10 (quoting Order of May 24, 1988). Consequently, the court held that appellants breached the collective bargaining agreement by failing to extend its terms and conditions of employment to North Bay employees. The district court awarded appellees $2.5 million in fringe benefit contributions, liquidated damages, interest, attorneys' fees and costs, and $2 million in punitive damages. Judgment was entered not only against Nor–Cal on the theory that North Bay was its

alter ego, but also against the Pettits in their individual capacities on the theory that appellants were entitled to pierce the corporate veil. On appeal, the defendants-appellants argue that the district court erred in granting summary judgment against Nor–Cal on the alter-ego theory, in failing to find the action time barred, in piercing the corporate veil to impose liability on the Pettits personally, and in awarding punitive damages. We uphold the court's ruling that the statute of limitations does not bar this action, but reverse summary judgment against Nor–Cal under the alter-ego theory and against the Pettits under the veil piercing doctrine. Because we reverse summary judgement, we vacate the award for punitive damages.

## I

### Primary Jurisdiction

As a preliminary matter, appellants argue that the doctrine of primary jurisdiction barred the district court from extending the Nor–Cal collective bargaining agreement to North Bay unless and until the National Labor Relations Board first determined that the employees of both firms constituted an appropriate bargaining unit. *See Brotherhood of Teamsters, Local No. 70 v. California Consolidators, Inc.,* 693 F.2d 81, 82–83 (9th Cir.1982), *cert. denied,* 469 U.S. 887, 105 S.Ct. 263, 83 L.Ed.2d 199 (1984). This argument misunderstands the differences between the two theories with which an illegal "double breasted" operation can be challenged.

Appellants are correct that it may be perfectly legal for a contractor to conduct business through a "double breasted" operation, one in which the same contractor owns both union and non-union companies for legitimate business purposes.[1] In such cases, the collective bargaining agreement of the union firm does not ordinarily apply to the non-union firm. Out of concern, however, that some contractors would use double-breasted operations to avoid their collective

---

1. As we said in *Carpenters' Local Union No. 1478 v. Stevens,* 743 F.2d 1271 (9th Cir.1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985), "[t]he non-union company can bid competitively on jobs that do not require union contractors, while the union company continues to bid on jobs requiring union contractors." *Id.* at 1275.

bargaining obligations, the courts and the NLRB have developed two conceptually related, but distinct theories—"single employer" and "alter ego"—to guard against such abuse. *Carpenters' Local Union No. 1478 v. Stevens*, 743 F.2d 1271, 1275–77 (9th Cir. 1984), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985).

■ The requirements of these two theories overlap substantially. Under both theories, the district court must first determine whether the two firms are a single employer by measuring the degree of common ownership, management, operations, and labor relations. *See id.* at 1276. If this threshold requirement is met, the next step depends on which theory is pursued.

■ Under the "single employer" theory, the district court must defer to the NLRB, which has primary jurisdiction to determine whether the employees of both the union and non-union firms constitute an appropriate bargaining unit. Only if the NLRB finds that they constitute a single unit may the collective bargaining agreement with the union firm be extended to the non-union firm. *See South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 805–06, 96 S.Ct. 1842, 1844–45, 48 L.Ed.2d 382 (1976) (per curiam); *Carpenters' Local Union No. 1478*, 743 F.2d at 1276–77 n. 7; *N.L.R.B. v. Don Burgess Constr. Corp.*, 596 F.2d 378, 386 (9th Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). This is because the fact that Nor-Cal and North Bay may constitute a single employer does not necessarily mean that their employees share a "community of interests" sufficient to make them a single bargaining unit. *See Don Burgess*, 596 F.2d at 386. This bargaining unit issue, which is a representational question, must be decided by the NLRB in the first instance. *See* 29 U.S.C. § 159(b) ("The Board shall decide in each case ... [what] the unit appropriate for the purposes of collective bargaining shall be...."); *Carpenters' Local Union No. 1478*,

743 F.2d at 1278; *Cappa v. Wiseman*, 659 F.2d 957, 959 (9th Cir.1981).

Accordingly, if appellees had relied solely on the "single employer" theory, appellants would have prevailed on their primary jurisdiction argument. The district court could not have extended the collective bargaining agreement to North Bay without a prior determination by the NLRB that the employees and North Bay and Nor–Cal constituted a single bargaining unit.

■ But appellees bypassed the "single employer" theory and instead invoked the "alter ego" theory. To prevail on the "alter ego" theory, appellees were required not only to make the threshold showing that the two firms were a single employer, but also to prove that North Bay was being used "in a sham effort to avoid collective bargaining obligations," *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1336 (9th Cir.1988), rather than for the pursuit of legitimate business objectives untainted by "union animus," *Haley & Haley, Inc. v. NLRB*, 880 F.2d 1147, 1150 (9th Cir. 1989) (per curiam). *See also A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir.1989) ("In all alter ego determinations an element of fraud or misrepresentation also exists."). It is the settled law of our circuit that once appellees prevailed on these issues, the district court could hold that the Nor–Cal bargaining agreement covered North Bay without first getting a unit determination from the NLRB. *See, e.g., Northwest Adm'rs, Inc. v. Con Iverson Trucking, Inc.*, 749 F.2d 1338, 1340 (9th Cir.1984); *Carpenters' Local Union No. 1478*, 743 F.2d at 1276–77 ("[A] showing [that employees of both companies constitute a single bargaining unit] is not required under the alter ego doctrine.").[2]

■ Relying on *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 108 S.Ct. 830, 98

---

**2.** Appellants rely on *United Ass'n of Journeymen & Apprentices, Local 342 v. Valley Eng'rs*, 975 F.2d 611 (9th Cir.1992), to argue that the primary jurisdiction doctrine also applies in an "alter ego" case. In *Valley Engineers*, the NLRB made a determination that the two firms were

neither a single employer nor alter egos. *See id.* at 613. The holding in *Valley Engineers* that the union could not collaterally attack this NLRB determination, *see id.* at 615, has no application to the case at bar because in this case, the NLRB has made no determination whatsoever.

L.Ed.2d 936 (1988), appellants also assert that ERISA does not provide the district court jurisdiction to enforce a collective bargaining agreement with North Bay employees who are not signatories to the Nor–Cal labor agreement. *Advanced Lightweight Concrete* provides appellants no support, however, because the Court said ERISA provides no jurisdiction to enforce *noncontractual* obligations, specifically, an employer's obligation under the National Labor Relations Act to make pension fund contributions *post*-contract. *See id.* at 548–49, 108 S.Ct. at 835–36. Because the case at bar concerns *contractual* obligations, namely the employer's obligation to contribute during the agreement's term, jurisdiction under ERISA was also proper.

## II

### Alter Ego

#### A

#### Standard of Review

■ On the merits, appellants claim that the grant of summary judgment on the "alter ego" theory was inappropriate. The alter ego test is, as they contend, highly fact specific. *See Local Joint Exec. Bd., Culinary Workers Union, Local 226 v. Royal Center, Inc.,* 796 F.2d 1159, 1164 (9th Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 881, 93 L.Ed.2d 835 (1987); *J.M. Tanaka Constr., Inc. v. NLRB,* 675 F.2d 1029, 1033 (9th Cir. 1982). Applying the standard test for summary judgment, we review the district court's decision *de novo* to decide whether a genuine issue of material fact exists. *See Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986).

■ Because appellees had the burden of proof on the question of alter ego, they had the burden of establishing a prima facia case on their motion for summary judgement. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once they did so, it became incumbent on appellants to "set forth specific facts showing that there is a

genuine issue for trial," Fed.R.Civ.P. 56(e), by evidence cognizable under that rule. Appellants' burden of contradicting appellees' evidence is not negligible. As the Supreme Court has explained, "[i]f the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citation omitted).

#### B

#### Appellees' Burden

The record clearly demonstrates that appellees have borne their initial burden of establishing facts that, if left uncontroverted, would show that North Bay was the alter ego of Nor–Cal.

#### 1

#### Single Employer

■ As explained above, the "alter ego" theory requires a threshold showing that Nor–Cal and North Bay constitute a single employer. The criteria for determining whether two firms constitute a single employer are (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations. *See NLRB v. Don Burgess Constr. Corp.,* 596 F.2d 378, 384 (9th Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). No one factor is controlling nor need all criteria be present. *See id.* The most important factor is centralized control of labor relations, which can be demonstrated either by showing common control of day-to-day labor matters, *see J.M. Tanaka Constr., Inc. v. NLRB,* 675 F.2d 1029, 1034 (9th Cir.1982), or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union, *see Don Burgess,* 596 F.2d at 385–86.

■ Appellees produced ample evidence that Nor–Cal and North Bay constitute a single employer. As for the first two factors—common ownership and common management—appellees have introduced evidence showing that Elmar Lee Pettit owned

both Nor–Cal and North Bay, and that he managed both businesses. In sworn testimony in the Solano County Municipal Court, Elmar Lee Pettit testified: "I own North Bay Plumbing.... I presently own three plumbing companies, including North Bay Plumbing." (S.E.R. Tab 8, at 3.) He has operated North Bay under three different contractor's licenses, two of which also name Audrey Pettit. But even those licenses listing Audrey Pettit as co-owner record Elmar Lee Pettit as the "Qualifying Partner or Responsible Managing Officer," which means that he certified, under penalty of perjury, that he would "exercise at all times during [his] employment such supervision and control of ... construction operations as is necessary to secure full compliance with the provisions of Section 7068.1 [of the California Business and Professions Code]...." (See S.E.R. Tab 55, at 13.) The licensing form that Elmar Lee Pettit signed explains that *supervision and control* includes any one or any combination of the following activities: supervising construction, running jobs, making installations, supervising employees, overseeing sub-contractors, checking jobs for proper workmanship, managing contracting activities or working full-time on jobs.

(*Id.*) Moreover, sworn declarations from several former employees and customers of North Bay state that Elmar Lee Pettit exercised this kind of control over North Bay's day-to-day operations. (S.E.R. Tabs 13; 41–44; 50–53.)

As for the third factor—interrelation of operations between the two companies—appellees presented evidence to show that Nor–Cal's purchasing agent established North Bay's accounts on the strength of Nor–Cal's credit and served briefly as purchasing agent for both companies. (See S.E.R. Tab 16.) The two companies exchanged materials and supplies and kept a running tab without charging each other for overhead or handling. (See S.E.R. Tab 14, at 4–5.) And as elaborated below, the two corporations and the Pettits commingled their finances. (See S.E.R. Tab 24, Exh. 21.)

Finally, as for the fourth and most important factor—centralized control of labor rela-tions—three North Bay plumbers testified that Elmar Lee Pettit hired them, (see S.E.R. Tabs 41–43), and four testified that he supervised, trained, or fired them, (see S.E.R. Tabs 41–44). In addition to such day-to-day control over labor relations, Elmar Lee Pettit apparently made the decision that North Bay would be a non-union shop. According to affidavits submitted by appellees, Elmar Lee Pettit told associates that a non-union shop was the only way he could make any money. (See S.E.R. Tab 16, at 14–16; Tab 41, at ¶¶ 2, 10; Tab 42, at ¶ 6.)

### 2

#### Intent

To establish North Bay as the alter ego of Nor–Cal, appellees must not only make the threshold showing that the two firms constituted a single employer but also must show that North Bay was created in "an attempt to avoid the obligations of [Nor–Cal's] collective bargaining agreement through a sham transaction or a technical change in operations." *A. Dariano & Sons, Inc. v. District Council of Painters No. 33,* 869 F.2d 514, 518 (9th Cir.1989). The appellees presented significant evidence of Elmar Lee Pettit's anti-union animus and his intent to avoid the collective bargaining agreement with Local 343. Evidence was presented to show that on numerous occasions he declared "I'm gonna close that fucking Union shop!" (S.E.R. Tab 42, at ¶ 6.) Further evidence was presented that he even told a customer that he had to take care to "conceal his involvement with North Bay so that he would not get caught at double breasting." (S.E.R. Tab 13, at ¶ 11.) The appellees also presented evidence that Elmar Lee Pettit used North Bay to do work that would have been performed by Nor–Cal if North Bay had not been created. In fact, their evidence showed that several Nor–Cal projects were transferred to North Bay abruptly, in the middle of the job. (See S.E.R. Tab 13, at ¶¶ 8–11; Tab 14, at ¶¶ 40–43; Tab 52, at ¶ 3.) Finally, the appellees presented evidence that Nor–Cal stopped bidding on jobs and shut down its operations in 1987. (See S.E.R. Tab 29, at ¶¶ 8–12).

Appellants argue that this evidence is insufficient as a matter of law given that the two firms coexisted for a significant period of time. They argue that the "alter ego" theory is appropriate only in situations in which the union firm is closed and a new non-union firm is immediately opened in its place. Although the "alter ego" theory is commonly applied in successorship situations, it is not limited to this context. Indeed, some period of simultaneous operations is not uncommon even when the non-union firm is alleged to be the successor of the union firm. For example, in *Haley & Haley, Inc. v. NLRB*, 880 F.2d 1147 (9th Cir.1989) (per curiam), a union trucker continued in business for sixteen months after its non-union alter ego successor was established. *See id.* at 1148. In this case, the period of simultaneous operation was admittedly much longer. However, by itself, simultaneous operation does not preclude a finding of alter ego.

In sum, appellees have produced substantial evidence that North Bay and Nor–Cal constituted a single employer and that Elmar Lee Pettit's purpose in establishing North Bay was to effect a technical change in operations that would enable him to continue his plumbing business while avoiding his obligations under the collective bargaining agreement with the employees of Nor–Cal. Accordingly, we hold that appellees have borne their initial burden of providing evidence that, if uncontroverted, would entitle them to prevail on the "alter ego" theory.

## C

### Appellants' Burden

Once the appellees have made their initial showing, the burden shifts to the appellants to show that they presented specific facts that raise a genuine issue of material fact for trial. While we hold that the appellants have failed to create a genuine issue of material fact as to whether North Bay and Nor–Cal constituted a single employer, we do hold that the appellants have produced evidence sufficient to raise such an issue with respect to Elmar Lee Pettit's intent to create and operate North Bay in an attempt to avoid the obligations of Nor–Cal's collective bargaining agreement.

### 1

### Single Employer

Appellants argue that the marital relationship between Elmar Lee and Audrey Pettit should not create a presumption that North Bay and Nor–Cal are a single employer, which is true, but this argument ignores Elmar Lee Pettit's sworn statements that *he* owned and managed North Bay.

Appellants also argue that Dave Adams managed Nor–Cal with Elmar Lee Pettit, while North Bay had a series of managers who worked for Audrey Pettit. But the evidence they cite does not contradict appellees' evidence that Elmar Lee Pettit owned and controlled Nor–Cal and was at the same time the driving force behind North Bay. In particular, it does not contradict appellees' evidence that Elmar Lee Pettit hired, trained, and fired North Bay's employees, and that Elmar Lee Pettit made the decision that North Bay would be non-union. Nor does appellants' evidence contradict appellees' proffer that Elmar Lee Pettit transferred Nor–Cal accounts to North Bay.

Elmar Lee Pettit does declare that "I told [customers] I could not help them, that they should call North Bay Plumbing." (C.R. 229.) But these general denials of involvement in North Bay's affairs conflict with his sworn statements on North Bay's business license that he would "supervis[e] and control" North Bay's plumbers. Such internal inconsistencies in a party's own testimony fail to create a *genuine* issue of material fact as to whether North Bay was the alter ego of Nor–Cal. *See Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (holding that "the necessity of choosing between the [appellants'] two conflicting versions" of a material fact does not defeat summary judgment).

### 2

### Intent

Even though the district court correctly ruled that there was no triable issue as to whether North Bay and Nor–Cal were a single employer, we believe that the court

erred in ruling that there was no material issue regarding Elmar Lee Pettit's intent. Pettit's testimony presents an alternate explanation of the reasons why North Bay was created and for the eventual demise of Nor–Cal. He states that North Bay was created at the suggestion of John Adams, who wanted to go into business with Audrey Pettit as a way of making ends meet during a strike of Nor–Cal employees. (*See* C.R. 115, at ¶ 2). Elmar Lee Pettit testified that Audrey Pettit thought starting the business was a good idea and that John Adams was the "driving power behind North Bay." (*Id.*). He further testified that North Bay concentrated on residential work, while Nor–Cal did more commercial projects. (*See id.* at ¶¶ 28–30).

■ While the fact that North Bay coexisted with Nor–Cal for a number of years does not preclude a finding of alter ego, the continued operation of Nor–Cal after the creation of North Bay is probative of Pettit's intent in creating North Bay. Had Pettit created North Bay with the intention of diverting all of Nor–Cal's business to his new, non-union shop, one would expect to find a relatively quick decrease in Nor–Cal's business accompanied by a corresponding increase in the business of North Bay. However, Pettit testified that Nor–Cal not only continued in operation for more than five years after the creation of North Bay, but that its workforce and gross earnings increased significantly over that time period. (*See id.* at ¶ 15). He stated that employment grew from about ten men to 25–30 men and gross income increased from $688,000 to over $2,500,000. (*See id*). This evidence is sufficient to raise a genuine issue of fact, precluding summary judgment.

Finally, Elmar Lee Pettit's testimony contradicts the appellees' suggestion that Nor–Cal's demise was the result of his intentional actions designed to close down the union shop in favor of North Bay. He testified that the dramatic decline in Nor–Cal's business in 1987 resulted from union organizers talking Nor–Cal employees into quitting their jobs in protest when Pettit refused to turn North Bay into a union shop. (*See id.* at ¶¶ 26–30).

Drawing the inferences most favorable to the nonmoving party, as we are required to do on summary judgment, we hold that the appellants' evidence creates a genuine issue of material fact regarding whether Pettit created and operated North Bay with the intention of avoiding Nor–Cal's collective bargaining obligations. Therefore, we reverse the district court's summary judgment against Nor–Cal.

### III

### Statute of Limitations

■ Appellants also argue that the district court should have found the union's claims barred by the statute of limitations.[3] Actions brought under § 301 of the LMRA are governed by the relevant statute of limitations of the forum state, in this case, California's four-year period for breach of contract claims. *See* Cal.Civ.Proc.Code § 337 (West 1993); *Waggoner v. Dallaire*, 649 F.2d 1362, 1367 (9th Cir.1981). The limitations period may be tolled, however, if appellants mislead the appellees. *See Waggoner*, 649 F.2d at 1368.

■ We agree with the district court that the doctrine of equitable tolling applies here. As early as December 1980, Local 343 officers suspected Elmar Lee Pettit of illegal double-breasting, but when they confronted him with their suspicions, he denied owning North Bay and explained that it was his wife's business. (*See* C.R. 58, Exh. C). The union nevertheless lodged an unfair labor practice charge with the NLRB, and withdrew the charge only when the Board stated that it lacked sufficient evidence to support a complaint and would dismiss the charge if it were not withdrawn. (*See* S.E.R. Tab 1, at ¶¶ 5–7.) The NLRB's determination that it lacked sufficient evidence rested, in turn, on two sworn statements from Elmar Lee Pettit, in which he denied having any ownership

---

3. Appellants also argue laches, but laches is an equitable defense unavailable in actions at law governed by a statute of limitations. *See International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 925–26 (9th Cir.1975); *County of Los Angeles v. City of Alhambra*, 27 Cal.3d 184, 165 Cal.Rptr. 440, 612 P.2d 24, 31 (1980).

interest in North Bay or having substantial knowledge of its operations or its interrelationship with Nor–Cal. (*See* S.E.R. Tabs 6 & 7.) Appellants offered no evidence to establish a genuine issue of fact as to whether these statements fraudulently concealed the facts from appellees.

■ Appellants contend that, once on notice of a potential claim, the appellees had an obligation to make a reasonable effort to investigate the facts. Specifically, they fault appellees for not enforcing an information request under their collective bargaining agreement. We reject this argument because the record shows that appellees went several times to Elmar Lee Pettit for information, both directly and through the NLRB, and were met with misleading assurances that he had nothing to do with North Bay. Where a plaintiff suspects the truth but investigates unsuccessfully, fraudulent concealment will toll the statute. *See Sears, Roebuck & Co. v. Blade,* 139 Cal.App.2d 580, 294 P.2d 140, 146–47 (1956). Accordingly, the statute of limitations does not bar this action.

## IV

### Piercing the Corporate Veil

■ We now consider the district court's ruling that there was no genuine issue of fact material to whether the union was entitled to pierce the corporate veil of Nor–Cal and impose personal liability upon the Pettits. In deciding whether to pierce the corporate veil, we consider three factors: "[1] the amount of respect given to the separate identity of the corporation by its shareholders, [2] the degree of injustice visited on the litigants by recognition of the corporate entity, and [3] the fraudulent intent of the incorporators." *Seymour v. Hull & Moreland Eng'g,* 605 F.2d 1105, 1111 (9th Cir.1979). Appellees must prevail on the first threshold factor and

on one of the other two. *See Board of Trustees v. Valley Cabinet & Mfg. Co.,* 877 F.2d 769, 773 (9th Cir.1989). In this case, the district court concluded that there was no genuine issue of fact as to any of the three factors and pierced the veil. We reverse the summary judgment on the veil-piercing claim because at a minimum, there are disputed fact issues regarding both the fraud and justice factors.

■ First, we conclude that the district court erred in holding that it was undisputed that "[t]he evidence establishes that North Bay was formed for the purpose of defrauding the union and the trust funds." Order Granting Summary Judgment at 10. In the context of the alter ego determination, we have held that there remains a genuine issue of fact as to whether Elmar Lee Pettit intended to evade the obligations of the collective bargaining agreement.[4] The fraudulent intent element of the veil-piercing doctrine would not be satisfied, however, merely by appellees' establishment of an entitlement to summary judgment against Nor–Cal and North Bay under the alter ego doctrine. The doctrines are analytically distinct and require different factual inquiries.

■ The alter ego doctrine as developed in labor law is analytically different from the traditional veil-piercing doctrine as developed in corporate law. The alter ego doctrine is designed to prevent employers from escaping their collective bargaining obligations by shifting work to non-union firms they also own. This doctrine has nothing to do with the doctrine that allows creditors of corporations to pierce the corporate shell to hold shareholders liable for corporate debts if they abuse the corporate form to defraud creditors.[5]

■ When unions invoke the alter ego doctrine to enforce collective bargaining obli-

---

**4.** Appellees also argue that the Pettits should be held personally liable as participating tortfeasors and for fraudulent misrepresentation under § 301 of the LMRA. These arguments were not addressed by the district court. However, both theories depend upon proving that the Pettits undertook to fraudulently evade their collective bargaining obligations. Since there remains a dispute regarding Elmar Lee Pettit's intent, sum-

mary judgment on these alternative grounds is also inappropriate.

**5.** *See Valley Cabinet,* 877 F.2d at 773 ("Garden variety fraud should be insufficient to pierce the corporate veil in the absence of evidence of shareholder abuse of the corporate form to defraud creditors.").

gations on behalf of their members, it is irrelevant whether or not the employers are corporations. The doctrine may be invoked regardless whether employers are corporations, partnerships, or wholly owned proprietorships. In this case, for example, appellees could have invoked the alter ego doctrine even if the Pettits were conducting their plumbing businesses as sole proprietorships rather than as corporations, and even if Nor–Cal and. North Bay were financially healthy corporations.

The veil-piercing doctrine does not come into play in this case unless and until appellees establish their right to a money judgment against Nor–Cal and North Bay under the alter ego doctrine. As we said in *Seymour*, the traditional rules on piercing the corporate shell at most affect the quality of a labor organization's remedy if it finds itself with a judgment against an insolvent corporate shell. *See Seymour*, 605 F.2d at 1111.

Appellees argue, however, that other acts of undisputed fraud can support their veil piercing claim. First, they argue that the Pettits committed tax fraud by paying personal expenses out of the corporate accounts and underpaying income taxes. However, this characterization of the business records is in dispute. *See* Declaration of Sam Gallina, C.R. 119.

Second, Appellees argue that the Pettits' fraudulent concealment of the relationship between North Bay and Nor–Cal satisfies the fraud factor. However, we have held that "[g]arden variety fraud should be insufficient to pierce the corporate veil in the absence of evidence of shareholder abuse of the corporate form to defraud creditors." *Valley Cabinet*, 877 F.2d at 773. Thus, it is not enough that the Pettits committed acts of fraud during the operation of their businesses. Instead, the plaintiffs must show that the "shareholder misused the corporate form to perpetrate the[ ] fraud." *Id.* Whether the Pettits misused the corporate form to fraudulently evade the obligations of the collective bargaining agreement is in dispute. However, false statements *about* the relationship between the Pettits' corporations do not, in themselves, constitute misuse *of* the corporate form to perpetrate a fraud.

Thus, summary judgment on the veil-piercing issue cannot be supported under a fraud theory.[6]

However, appellees' argue that the *injustice* factor of the veil-piercing inquiry has been satisfied. They contend that not piercing the corporate veil would allow the Pettits to retain the financial rewards of their fraudulent scheme. But this presumes the truth of what is in genuine dispute—that the Pettits misused the corporate form to drain corporate assets. Appellees also claim that it would be unjust not to pierce the veil because they would not be able to recover damages otherwise. But our precedents do not recognize that the "inability to collect ... by itself, constitute[s] an inequitable result." *Seymour*, 605 F.2d at 1113.

Viewed in a light most favorable to the Pettits, the evidence raises genuine issues of fact on both the fraud and injustice factors of the traditional veil-piercing inquiry. Accordingly, the Pettits cannot be held personally liable for the obligations of their corporations at summary judgment.

## V

### Punitive Damages

Because we reverse the summary judgments entered against all defendants, we necessarily vacate the award of punitive damages. We therefore do not reach the issues raised by appellants regarding availability of punitive damages as a matter of law.

### CONCLUSION

The summary judgment against all defendants is VACATED. The cause is REMANDED for further proceedings consistent with this opinion.

---

**6.** We have reviewed Appellees' other claims of fraud and find them to be meritless.