SONY COMPUTER ENTERTAINMENT AMERICA, INC., a Delaware corporation, Plaintiff,

v.

DIVINEO, INC., et al., Defendants.

No. C 04–4200 CW.

United States District Court, N.D. California.

Sept. 11, 2006.

James G. Gilliland, Angus M. Mac-Donald, Leigh Aimee Kirmsse, Timothy R. Cahn, Townsend & Townsend & Crew LLP, San Francisco, CA, Anne–Marie Dinius, Jennifer Y. Liu, Foster City, CA, for Plaintiff.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AND APPLICATION FOR DEFAULT JUDGMENT ON DIGITAL MILLENNIUM COPYRIGHT ACT CLAIMS

WILKEN, District Judge.

Plaintiff Sony Computer Entertainment America, Inc., moves for summary adjudication of its Digital Millennium Copyright Act (DMCA) claim against *pro se* Defendant Frédéric Legault. Mr. Legault opposes the motion.[1] Plaintiff separately applies for default judgment against Defendants Divineo, Inc., Divineo U.K., Divineo SARL and Max Louarn (collectively, the defaulting Defendants). The defaulting Defendants have not opposed Plaintiff's application for default judgment. The matters were taken under submission on the papers. Having considered the papers filed by Plaintiff and Mr. Legault, the Court grants in part Plaintiff's motion for summary adjudication of the DMCA claim against Mr. Legault and grants Plaintiff's application with respect to its DMCA claims against the defaulting Defendants.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.

Plaintiff, a wholly owned subsidiary of Sony Computer Entertainment, Inc., a Japanese corporation, is responsible for marketing and distributing PlayStation® and PlayStation® 2 computer entertainment systems (the PlayStation systems) in North America. Jessop Decl. ¶ 2. Plaintiff is the registered copyright holder of at least 130 copyrighted computer game programs that are compatible with the PlayS-

---

1. Mr. Legault has been notified of the requirements for opposing a motion for summary judgment. *See* June 29, 2006 Clerk's Notice (attaching Order Providing Notice to *Pro Se* Defendant of Requirements for Opposing Motion for Summary Judgment).

tation systems. *Id.;* MacDonald ¶ 32. One way in which Plaintiff protects this copyrighted material is an authentication process that occurs "whenever a software disc boots up on a PlayStation system." Jessop Decl. ¶ 4. Only if the PlayStation system verifies that the inserted disc is authentic will the user be allowed access to the material on it. *Id.* ¶ 5. If a user burns a copy of a copyrighted PlayStation game, a unique code that is part of every authentic disc will not be copied, thus preventing the user from playing the copy on the PlayStation systems. *Id.* ¶ 6.

In this lawsuit, Plaintiff accuses Defendants of trafficking in devices, including HDLoader, modification chips (also known as "mod chips") and others (referred to collectively as "the devices"), which allow users to circumvent this authentication technology. The HDLoader is a software circumvention device that "permits a user to make an unauthorized copy of PlayStation-compatible software (i.e., video games) onto a separate hard drive connected to the PlayStation system." Jessop Decl. ¶ 10. Jerry Jessop, Sony's Director of Hardware Engineering, declares, based on his experience with the PlayStation system and testing of the HDLoader software, that the "primary function and purpose of an HDLoader is to bypass the technological protections in PlayStation systems that SCEA [Sony] has implemented to protect copyrighted works, including its own copyrighted works." *Id.* ¶ 14. Mod chips are computer chips that, when wired to a PlayStation console, circumvent the authentication system and allow the system to play unauthorized software. *Id.* ¶ 15. The "primary function" of mod chips (including the Duo, Magic, Ghost and Neo chips) is to bypass the copyright protections afforded by PlayStation's technological measures. *Id.* ¶ 18. Finally, Mr. Jessop declares that devices known as "slide cards, 'Swap Magic,' and boot discs" allow

a user to boot up a PlayStation console and perform a disc swap without triggering the software and hardware mechanisms within the PlayStation system that initiate the authentication sequence; these devices have the "sole function" of circumventing Sony's authentication process. *Id.* ¶ 19.

Mr. Legault is the sole shareholder and president of Divineo, Inc. (hereinafter Divineo), a Canadian corporation that sells video game products through a website at the divineo.com domain name. Def. Legault's Answer ¶¶ 7, 10; MacDonald Decl., Ex. 4, Def. Divineo's Resp. to Pl.'s Interrogs No. 17. Divineo SARL is a French corporation that also promotes, markets and sells certain video game products. Mr. Louarn is its officer and founder. Legault Decl. ¶ 1. As part of his business relationship with Mr. Louarn, Mr. Legault "managed retail sales from the www.divineo.com Web site for Canada and for all countries which did not have Divineo stores." Legault Decl. ¶ 2. One of those countries is the United States. However, Mr. Legault and Divineo admit that on "rare" occasions they also handled wholesale orders at the direction of Divineo SARL. MacDonald Decl., Ex. 4, Def.'s Resp. to Pl.'s First Set of Interrogs. No. 2.

The divineo.com website has offered for sale the accused devices, including the HDLoader, the Duo, Magic and Neo mod chips, and slide cards and Swap Magic. MacDonald Decl., Ex. 24, Divineo.com Print–Outs (visited September 30, 2004). Mr. Legault describes his products as "chips to specialized clients who had more technical knowledge than the average consumer and who wanted to modify their video games consoles to make them as similar as possible to a computer." Legault Decl. ¶ 3. However, he admits that the HDLoader product "targeted the mainstream market." Legault Decl. ¶ 4.

According to Plaintiff's attorney, Angus MacDonald, the divineo.com website advertised mod chips as recently as April 1, 2006, but it has not done so since then. MacDonald Decl. ¶ 28. Mr. Legault explains that Divineo told Plaintiff in March, 2006 that "it would stop selling the litigious [sic] products hoping this would show Sony its good faith." Legault Decl. ¶ 9.

Plaintiff submits what Mr. MacDonald declares to be a "true and correct copy of a summary of Divineo Inc.'s sales of circumvention devices into the United States from the fourth quarter of 2003 through the second quarter of 2005, as produced by Divineo Inc. during discovery." MacDonald Decl. ¶ 26, Ex. 25. This summary document shows retail sales of 7,772 devices by Divineo between November, 2003 and June, 2005.[2] *Id.* Ex. 25.

Plaintiff also presents some evidence of wholesale sales of the devices. According to invoices submitted by Mr. MacDonald, Mr. Louarn and Divineo U.K. shipped 400 HDLoaders to former Defendant and California resident Chau Ngo on July 19, June 29 and June 2, 2004, and 620 devices to Ohio resident Steven Filipiak between October 1, 2003 and June 24, 2004. MacDonald Decl., Exs. 21 and 22. Former defendant Chau Ngo declares that he placed a wholesale order for 100 HDLoaders at divineo.com. Mr. Ngo states that he primarily communicated with an individual who identified himself as Max Louarn, but that toward "the end of my business dealings with Divineo.com," he also "had email

communications with an individual identified as Frederic Legault," including an exchange in which he returned 200 HDLoaders to Mr. Legault for a refund. MacDonald Decl., Ex. 5, Ngo Decl. ¶ 7, 12. Mr. Ngo forwarded to Plaintiff's attorney a September 20, 2004 email purportedly from "Divineo Wholesale" to Mr. Ngo stating, in part, "we forwarded your request to frederic@divineo.com, he is the manager of divineo.com[.] We do not sell hdloader any more ourselves." [3] MacDonald Decl., Ex. 26. Mr. Ngo also forwarded to Mr. MacDonald a September 21, 2004 email purportedly from "Divineo (Fred) [mailto: frederic@divineo.com]" with the subject "Re: Divineo USA Wholesale inquiry," instructing Mr. Ngo to return unusable HDLoader software and "[d]o a good packing, I need them in good condition, to re-sell them." *Id.* Mr. Legault somewhat obliquely denies that he did business with Mr. Ngo, declaring

> no sale was made for Ngo and no payment was received from this company. Ngo can prove that it paid Divineo UK and that all business relationships it had were directly with Max Louarn/Divineo SARL/UK.

Legault Decl. ¶ 12.

Although he criticizes Mr. Jessop as a Sony insider, Mr. Legault presents no evidence that contradicts Mr. Jessop's testimony that the primary function of HDLoader and mod chips, and the sole function of slide cards, Swap Magic and boot discs, is to circumvent the authentication process of the PlayStation systems.

---

**2.** Plaintiff also submits Mr. Legault's Federal Express account information, showing that he has paid the shipping company a total of $1.06 million since his account was created on January 9, 2001. MacDonald Decl., Ex. 27. However, this evidence is of little probative value because it does not show what portion of that total can be attributed to shipment of the alleged circumvention devices.

**3.** This and other statements purportedly made by Mr. Louarn or Mr. Legault to Mr. Ngo constitute hearsay, and therefore the Court cannot consider them to prove the truth of the matters asserted therein.

Instead, Mr. Legault offers testimony regarding ways that these devices may be used with the PlayStation systems that do not involve infringement of Plaintiff's copyrighted works. For instance, Mr. Legault is aware of "more than 150 types of homemade software (practical and games) on Internet for Playstation 2 and for PSP," such as a reprogrammed version of the classic "Space Invaders" game. Legault Decl. ¶ 14. He also declares that software developers may wish to test their own games by using Divineo's products, in combination with PlayStation consoles, as a less expensive alternative to purchasing a specialized Sony console that will run any game. Legault Decl. ¶ 16. He submits the HDLoader instruction manual, which touts the product as a way to reduce game loading times, because PlayStation 2 can read hard drive data more quickly than data on CDs or DVDs, and as a way to "make gaming more convenient" by allowing users to store games on a hard disk drive, "eliminating the need to change discs each time you wish to pay a different game." Legault Decl., Ex. L., E–1. Mr. Legault also offers a "legal notice" by Divineo, warning users of its website that they were responsible for the legality of their own use of website material. Legault Decl., Ex. G.

On October 4, 2004, Plaintiff filed suit against Divineo and three California purchasers of Divineo products. Shortly after Divineo was served, Plaintiff sought a stipulation, through Divineo's then-counsel, that Divineo and Mr. Legault would cease selling circumvention devices during the pendency of the action. MacDonald Decl. ¶ 7. According to Mr. MacDonald, Divineo and Mr. Legault refused to agree to the proposed stipulation; however, Mr. Le-

gault did agree to stop selling HDLoader software in February, 2005. *Id.* Mr. Legault denies that he refused to agree to cease selling the devices, claiming, "With a simple letter of default, without making any admission whatsoever and only to avoid legal proceedings, Frédéric Legault would have stopped selling the products specified in Sony's procedures." Legault Decl. ¶ 5.

Plaintiff also initiated proceedings in French court against Mr. Louarn and Divineo SARL in summer, 2004. MacDonald Decl. ¶ 10. According to an August 5, 2004 order of the Commercial Court of Paris, Divineo SARL and Mr. Louarn withdrew all reference to HDLoader software from their website and were to "irrevocably undertake to cease selling, in any way, directly or indirectly, the HDLoader software and making reference whatsoever to this software." MacDonald Decl., Ex. 7, Commercial Court of Paris, Interim Order of Thursday, Aug. 5, 2004 (English Translation) at 3.

On September 21, 2004, Mr. Louarn[4] and Divineo SARL signed an "Undertaking" whereby they agreed, in exchange for Plaintiff not taking action against them for past infringement, that

> we will not, and will procure that our respective group companies, agents and resellers will not, manufacture, replicate, copy, order, offer for sale, dispose of (by sale or otherwise), distribute to the public, or part with possession in any other way, of HDLoader, HDAdvance or any other product or component that (individually or with other products or components) facilitates the removal or circumvention of the copy-protection features contained in your consoles and games (the Products). For

---

4. In its brief, Plaintiff erroneously states that it was Mr. Legault who signed the undertaking.

the avoidance of doubt, in pursuance of this undertaking, we shall immediately ensure that all references to the Products, including their offer for sale, are removed from all websites under our control or the control of our group companies, agents and resellers.

MacDonald Decl., Ex. 8. However, Mr. Legault declares that he never actually saw or read the agreement until the present summary judgment proceedings, and that Mr. Louarn assured him that the agreement "did not affect Divineo Canada." Legault Decl. ¶ 4.

Plaintiff filed an amended complaint naming Mr. Legault and the rest of the defaulting Defendants on June 3, 2005. Plaintiff alleges Defendants' sale of circumvention devices violates the DMCA, 17 U.S.C. § 1201 *et seq.*, the federal Copyright Act, 17 U.S.C. § 101 *et seq.*, the Lanham Act, 15 U.S.C. § 1125 and California's unfair competition law, California Business & Professions Code § 17200 *et seq.*

Mr. Legault and Divineo [5] answered the amended complaint on September 12, 2005. In their answer, Mr. Legault and Divineo acknowledged the Court's personal jurisdiction over them and admitted that "mod chips" may be configured by consumers to allow a copied disc to be played on the PlayStation systems. Answer ¶ 37. However, they denied that this was the "primary" use of mod chips.

In response to Plaintiff's first set of interrogatories, Divineo and Mr. Legault stated that they "did not and do not sell [circumvention devices] to resellers or wholesalers, do not maintain inventory sufficient to sell to resellers or wholesalers, and limit sales to only retail sales other than on rare occasions when specifically directed by Divineo S.A.R.L." MacDonald Decl., Ex. 4, Def.'s Resp. to Pl.'s First Set of Interrogs. No. 2. Mr. Legault concedes that he did not respond fully to Plaintiff's initial requests for discovery, but says that this was because of Plaintiff's own refusal to negotiate with Divineo as promised, and due to "Canadian laws being what they are." Legault Decl. ¶ 8. Mr. Legault attaches to his declaration copies of Canada's Personal Information Protection and Electronic Documents Act and Québec's Act Respecting the Protection of Personal Information in the Private Section, R.S.Q. chapter P–39–1. Legault Decl., Ex. C.

Arguing that Divineo and Mr. Legault's initial discovery responses were inadequate, Plaintiff served a second set of interrogatories, a second set of document requests and a first set of requests for admission on February 8, 2006. MacDonald Decl., Exs. 16, 17 and 18. Neither Divineo nor Mr. Legault responded to these discovery requests by the March 10, 2006 deadline, and they did not seek an extension of the deadline. Plaintiff also served deposition notices on Divineo and Mr. Legault; the depositions were stayed, at Mr. Legault's request, in order allow Divineo and Mr. Legault to hire new counsel, but they did not do so. MacDonald Decl. ¶ 21.

Mr. Legault complains generally that he has only been able to communicate with Plaintiff through its counsel, and that he does not speak fluent English. Legault Decl. ¶ 6. Mr. Legault is not entitled to

---

**5.** Divineo's counsel has since withdrawn, and because Divineo, a corporate defendant, no longer appears in court through counsel, it is in default. *See* March 29, 2006 Order Relieving Sideman & Bancroft LLP and Sutherland Asbill & Brennan LLP as Attorneys of Record.

The Court warned the parties that although Mr. Legault could represent himself in this action, he could not represent Divineo, and Divineo could not represent itself. The Court gave Divineo four weeks to make an appearance through counsel, but it did not do so.

communicate directly with Plaintiff when it is represented by counsel. He also has not shown any specific reason why his lack of fluency in English has impaired his former attorney's representation of him, or that it has impaired his representation of himself.

Plaintiff objects to several of the statements in Mr. Legault's declaration on grounds of hearsay, relevance and reliability, and to all of his exhibits on the grounds that they lack foundation or have not been properly authenticated. To the extent the Court relies on Mr. Legault's statements to prove the truth of the matters asserted, Plaintiff's objections are overruled; otherwise, Plaintiff's objections are denied as moot.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Eisenberg*, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

*Id.*

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. *Id.; see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of

the non-moving party's claim or defense, it must produce affirmative evidence of such negation. *Nissan*, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. *Id.*

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. *Id.* This is true even though the non-moving party bears the ultimate burden of persuasion at trial. *Id.* at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a *prima facie* showing in support of its position on that issue. *UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir.1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's *prima facie* case. *UA Local 343*, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." *Id.* This standard does not change merely because resolution of the relevant issue is "highly fact specific." *Id.*

## DISCUSSION

### I. Mr. Legault's DMCA Liability

#### A. Applicable Law

Enacted on October 28, 1998, the DCMA implements two earlier World Intellectual Property Organization treaties. The DMCA prohibits the circumvention of a technological measure that effectively controls access to a work protected under this title. 17 U.S.C. § 1201(a)(1)(A). Section 1201(a)(2) provides,

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

Section 1201(b)(1) similarly prohibits the trafficking of devices primarily designed or produced for the purpose of circumventing "protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof." To "circumvent protection afforded by a technological measure" is defined to mean "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." *Id.* § 1201(b)(2)(A). A technological measure "effectively protects a right of a copyright owner" if, "in the ordinary course of its operation," it "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." *Id.* § 1201(b)(2)(B).

■ Plaintiff has made a *prima facie* showing of evidence in support of its position that Mr. Legault violated the DMCA by trafficking in devices that are primarily designed or produced for the purpose of circumventing the PlayStation authentication system which otherwise controls access to software played on the system, including Plaintiff's own copyrighted PlayStation games.

None of Mr. Legault's evidence is sufficient to raise a dispute regarding Mr. Jessop's statements that the "primary" or "sole" function of the accused Divineo devices is to circumvent Plaintiff's authentication system. The conclusory assertion in Divineo's response to Plaintiff's request for admission denying that " 'mod chips' are designed primarily to circumvent technological measures" does not constitute evidence sufficient to withstand summary judgment in the face of Mr. Jessop's testimony to the contrary. Mr. Legault has shown evidence that the products he sold may be used in a manner that does not involve accessing copies of Plaintiff's copyrighted works or that makes fair use of such works. For instance, users of mod chips could use them to ensure the interoperability of an independently created computer program, protected by DMCA's "reverse engineering" exception. § 1201(f). The Court also takes as true Mr. Legault's assertions in his signed opposition that use of a mod chip may be the only way to play legally purchased, imported games on a United Stated PlayStation console. However, downstream customers' lawful or fair use of circumvention devices does not relieve Mr. Legault from liability for trafficking in such devices under the DMCA. *See 321 Studios v. Metro Goldwyn Mayer Studios, Inc.,* 307 F.Supp.2d 1085, 1097 (N.D.Cal.2004) (holding that downstream customers' uses are not relevant to determining defendant's liability under DMCA); *United States v. Elcom. Ltd.,* 203 F.Supp.2d 1111, 1120 (N.D.Cal.2002) (noting that Congress banned only trafficking in and marketing of devices designed to circumvent use restriction technology, not the act of circumvention). The fact that users of mod chips must be technologically sophisticated is not evidence that the purpose of the mod chips is not circumvention. Finally, Divineo's "legal notice" to its customers is not relevant to its own liability under the DMCA.

Mr. Legault argues that the PlayStation authentication process is not a "technological measure" within the meaning of the DMCA because it does not effectively protect against persons who use devices such as HDLoader to store games on a hard drive. The fact that circumvention devices may be widely available does not mean that a technological measure is not, as the DMCA provides, effectively protecting the rights of copyright owners "in the ordinary course of its operation." A New York district court concluded that the construction of the statute urged by Mr. Legault

> would limit the application of the statute to access control measures that thwart circumvention, but withhold protection from those measures that can be circumvented. In other words, defendants would have the Court construe the statute to offer protection where none is needed but to withhold protection precisely where protection is essential.

*Universal Studios v. Reimerdes,* 111 F.Supp.2d 294, 318 (S.D.N.Y.2000); *see also 321 Studios,* 307 F.Supp.2d at 1095 (comparing defendant's similar argument to the claim that a deadbolt is ineffective because skeleton keys are readily available on the black market).

Mr. Legault argues that Mr. Jessop and Mr. Ngo are not objective witnesses because the former is a long-time Sony employee, and the latter is cooperating with

Plaintiff in order to avoid his own liability. The fact that Plaintiff's witnesses may be biased does not render their otherwise uncontradicted statements inadmissible, and does not overcome Plaintiff's motion for summary adjudication.

The Court agrees that Plaintiff's briefs at times obscure the difference between Mr. Legault and Mr. Louarn, Divineo SARL and Divineo U.K. However, the few documents produced by Divineo and Mr. Legault, namely the summary of Divineo's sales of circumvention devices into the United States from the fourth quarter of 2003 through the second quarter of 2005, are sufficient to establish Divineo and Mr. Legault's liability.

Mr. Legault's other evidence relates to irrelevant accusations against Plaintiff involving unrelated matters, such as news articles covering criticism of and legal action against Sony BMG Music Entertainment's use of antipiracy technology in music CDs. *See* Legault Decl., Ex. H. This evidence does not establish a dispute of fact as to Mr. Legault's liability under the DMCA.

## II. Minimum Statutory Award

The DMCA provides,

At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of no less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

17 U.S.C. § 1203(c)(3)(A). Plaintiff has elected to pursue statutory damages in this case.

Section 1203(c)(5)(A) further provides that a court may reduce the award of damages "in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation." Although Mr. Legault declares that he was not aware that the undertaking between Mr. Louarn and Plaintiff applied to him, this does not amount to a claim that he had no reason to believe that his acts were in violation of the DMCA. For the reasons discussed in Section III below, the Court finds that Mr. Legault's sales were in fact willful, at least since Plaintiff's November, 2004 filing of this lawsuit against Divineo.

In determining the number of violations, the Court finds that a dispute of fact exists as to whether any of Mr. Ngo's wholesale purchases can be attributed to Mr. Legault. The evidence Sony offers for the Ngo sale is mostly hearsay, and Mr. Legault has denied selling devices to Mr. Ngo. If Plaintiff wishes to increase the statutory damages available to it by proving at trial that Mr. Legault committed additional violations of the DMCA, it may do so.

Instead, the Court looks only to the undisputed evidence of Mr. Legault and Divineo's retail sales. This shows that Divineo sold 7,772 devices between November, 2003 and June, 2005. Mr. MacDonald estimates that Divineo and Mr. Legault likely sold an additional 3,890 devices between July, 2005 and March 31, 2006, assuming that sales held constant at an average of 389 devices per month. Mr. Legault persuasively argues that this assumption is unfair, because the average is artificially increased by the strong sales of the "mainstream" HDLoader device, which Divineo ceased selling at the beginning of the first quarter of 2005. However, he does not suggest an alternative calculation, or explain his failure to provide more recent sales data in response to Plaintiff's second set of discovery requests.

The Court finds that a reasonable average estimate for the last ten months is 224 devices (the average sold per month during the second quarter of 2005, the last quarter for which data is available). Therefore, the Court finds that Mr. Legault and Divineo sold approximately 10,012 circumvention devices. Plaintiff is thus entitled to a minimum statutory award of $2,002,400.00.

III. Enhancement of Minimum Statutory Award

■ Plaintiff asks the Court to exercise its discretion to enhance the statutory award against Mr. Legault to $800 per violation on the grounds that (1) he failed to respond fully in discovery; (2) his violations of the DMCA were willful; and (3) his conduct likely caused even greater harm to Plaintiff and other software publishers.

The Court agrees that, based on the record before it, Mr. Legault has failed to respond fully in discovery. This is made particularly clear by his failure to produce any records relating to those "rare" occasions when he admittedly engaged in wholesale sales. Due to Mr. Legault's *pro se* status, however, the Court will not enhance fees on the basis of his discovery failures.

As evidence of his good faith, Mr. Legault points to his production of certain sales invoices and his decision to stop selling the HDLoader in early 2005. The production of the invoices was necessary to comply with Plaintiff's discovery requests, and thus is not evidence of good faith. Although Mr. Legault's decision to stop selling the HDLoader was sensible, he offers no credible explanation for his continued trafficking in other circumvention devices after that point. Therefore, the Court will enhance the statutory award to $800 per violation for all sales after the first quarter of 2005 (an estimated 2,913 devices), bringing the total statutory award to which Plaintiff is entitled to $3,750,200.00. *See Sony Computer Entertainment America, Inc., v. Filipiak,* 406 F.Supp.2d 1068, 1075 (N.D.Cal.2005) (awarding enhanced statutory damages of $800 per circumvention device in related DMCA case).

The Court declines to enhance the statutory awards on the basis of the alleged greater harms cause by Mr. Legault's acts; Plaintiff does not show that this harm goes beyond the expected effects of violations of the DMCA. The $3.75 million damages award is an adequate sanction for Mr. Legault's conduct.

IV. Attorneys' Fees, Costs and Prejudgment Interest

■ The DMCA authorizes a court, "in its discretion," to allow recovery of costs and to award "reasonable attorney's fees" to the prevailing party. 17 U.S.C. § 1203(b)(4), (5). The Court agrees that an award of costs and attorneys' fees is appropriate here, especially in light of Mr. Legault and Divineo's willful violations.

V. Defaulting Defendants

With respect to the remaining defaulting Defendants, Divineo U.K., Divineo SARL and Max Louarn, Plaintiff has also established a prima facie case for liability under the DMCA.

Divineo U.K., Divineo SARL and Max Louarn never provided any discovery in this case. However, Plaintiff has obtained documents showing the importation and sales of 1020 devices by Divineo U.K. and Mr. Louarn to Mr. Ngo and Mr. Filipiak. In addition, Plaintiff has shown evidence that Max Louarn and Divineo SARL knew of, and worked in concert with, Mr. Legault and Divineo. Therefore, the remain-

ing defaulting Defendants are responsible for an estimated 11,032 violations of the DMCA with respect to sales of devices to the United States. Accordingly, the minimum statutory damages for which Divineo U.K., Divineo SARL and Max Louarn are responsible is $2,206;400.00. With respect to the approximately 5,975 sales that took place after Mr. Louarn and Divineo SARL signed the September 21, 2004 "Undertaking," the Court finds that the sales were willful. Therefore, the Court will enhance the statutory award to $800 per violation for those sales, bringing the total amount of statutory damages to $5,791,400.00.

Although Plaintiff moved for default judgment on all of its claims against the defaulting Defendants, its papers address only its claims under the DMCA. Therefore, the Court denies Plaintiff's application for default judgment on its federal copyright, Lanham Act and California State law claims, and dismisses these claims for failure to prosecute.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for summary adjudication of its DMCA claims against Mr. Legault (Docket No. 85) and GRANTS Plaintiff's application for default judgment with respect to its DMCA claims against defaulting Defendants Divineo, Divineo U.K., Divineo SARL and Mr. Louarn (Docket No. 83). Plaintiff's remaining claims against the defaulting Defendants are dismissed. The Court finds that Plaintiff is entitled to $3,750,200.00 in statutory damages from Mr. Legault and Divineo, jointly and severally, and to $5,791,400.00 in statutory damages from Divineo U.K., Divineo SARL and Mr. Louarn, jointly and severally. Plaintiff shall recover of Defendants its costs and a reasonable attorneys' fee in connection with its DMCA claims.

Defendants shall be jointly and severally liable for attorneys' fees and costs.

The claims and issues remaining for trial are Plaintiff's federal copyright, Lanham Act and California State law claims claims against Mr. Legault, and Mr. Legault and Divineo's liability for additional damages arising from alleged wholesale sales. If Plaintiff does not wish to pursue these remaining claims and issues, it may request that the Court dismiss the remaining claims, in which case the Clerk will enter judgment in Plaintiff's favor on the DMCA claims against all Defendants. If Plaintiff chooses not to pursue its remaining claims at trial, it should notify the Court of its decision and submit an application for attorneys' fees and costs within ten days of the date of this order. If Plaintiff does so, a case management conference will not be scheduled.

Pursuant to 17 U.S.C. § 1203(b)(1), the Court further orders that all Defendants, and their agents, attorneys, employees, and all other persons in active concert or participation with them who receive notice of this order, shall be permanently enjoined and restrained from:

1. Offering for sale, selling, providing, distributing, exporting, importing, or shipping, into the United States or to customers located in the United States, directly or indirectly, all devices that circumvent the PlayStation systems' technological security measures ("circumvention devices"); and

2. Offering for sale, selling, providing, distributing, exporting, importing, or shipping, to any persons or other entities that Defendants know, or have reasons to know, have shipped, sold, distributed, provided, or exported at any time any circumvention devices to customers located in the United States.

For three years from the date of entry of final judgment, the Court shall retain

jurisdiction for the purpose of modifying or interpreting this order, the enforcement thereof or the punishment of any violations thereof. *See* 17 U.S.C. § 1203(c)(4) (providing that courts may award triple damages upon finding that a person violated § 1201 or § 1202 within three years after entry of final judgment).

IT IS SO ORDERED.