**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THE ESTATE OF JERRY A. AMARO
III; GERALDINE MONTOYA;
STEPHANIE MONTOYA,
        *Plaintiffs-Appellees,*

       v.

CITY OF OAKLAND; E. KARSSEBOOM;
R. HOLMGREN; S. NOWAK; M.
BATTLE; C. BUNN; M. PATTERSON;
T. PENA; EDWARD POULSON;
RICHARD WORD,
        *Defendants-Appellants.*

No. 10-16152

D.C. No.
3:09-cv-01019-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
June 16, 2011—San Francisco, California

Filed July 28, 2011

Before: Mary M. Schroeder and Carlos T. Bea,
Circuit Judges, and Janis L. Sammartino, District Judge.*

Opinion by Judge Bea

---

*The Honorable Janis L. Sammartino, District Judge for the U.S. District Court for Southern California, San Diego, sitting by designation.

## COUNSEL

James B. Chanin, Julie M. Houk, Law Offices of James B. Chanin, Berkeley, California; John L. Burris, Law Offices of John L. Burris, Oakland, California, for the plaintiffs-appellees.

John A. Russo, Randolph W. Hall, Christopher Kee, City Attorney's Office, Oakland, California; Aimee Hamoy-Perera, John Verber, Burnham Brown, Oakland, California, for the defendants-appellants.

**OPINION**

BEA, Circuit Judge:

This interlocutory appeal requires us to resolve only the following question certified by the district court: whether the doctrine of equitable estoppel should apply where a plaintiff believes she has a 42 U.S.C. § 1983 claim but is dissuaded from bringing the claim by affirmative misrepresentations and stonewalling by the police. We hold that the equitable doctrine *does* apply in such a context and affirm the district court's holding on that legal question.[1]

**Background**

On March 23, 2000, Jerry Amaro—a 36-year old Oakland resident—was arrested during a reverse drug sting operation by the Oakland Police Department ("the Department"). Undercover officers posed as drug dealers during the operation, while other officers waited in a nearby van to apprehend the buyers when the purchases were completed. According to the police report of Amaro's arrest, Amaro purchased crack cocaine from an undercover officer and was apprehended as he left the scene. The police report does not mention any use of force by the officers during Amaro's arrest. However, Amaro and several witnesses contended that Amaro was beaten severely while being arrested. Timothy Murphy, who was also arrested by the police during the sting operation, stated in his deposition that officers repeatedly kicked Amaro in the ribs, punched him in the face, and kneed him in the back. This testimony was corroborated by several independent non-arrestee witnesses, including Theresa Batts, who testified that Amaro was "bum rushed," and "unnecessarily" beaten by the officers in an "overly violent" manner. Another witness, Laureen White, testified that she saw officers punch the 140-

---

[1]This court has jurisdiction to review certified questions of law on interlocutory appeal under 28 U.S.C. § 1292(b).

pound Amaro several times in the back. According to Murphy, when Amaro was placed in the police car, Amaro was bleeding from his nose and mouth, crying, and moaning in pain.

While being transported to jail, Amaro complained of pain in his ribs to the arresting officers and requested medical attention from them. The officers denied Amaro's requests. The admitting officer at the Oakland county jail testified that Amaro had bruises on his face at the time of booking and complained of rib injuries. Amaro's cell-mate also testified that Amaro complained of constant pain and could barely get out of bed. During this time, despite Amaro's repeated requests for medical treatment, he was given only Motrin, an over-the-counter analgesic for the claimed pain.

On March 28, 2000, five days after his arrest, Amaro was released from custody. Amaro informed his mother, Geraldine Montoya—the lead plaintiff in this action—that he had been beaten by Oakland police officers, and that he had asked for medical attention several times but had been denied treatment. Amaro showed his mother several large bruises on his face and his body to support this assertion. The pain persisted and on April 18, Amaro was seen by Dr. Angelica Green. Dr. Green took X-rays of Amaro's chest and torso. The X-rays revealed five fractured ribs and a collapsed lung. Dr. Green recommended Amaro seek immediate emergency care to drain fluid from his lungs. After his meeting with Dr. Green, Amaro showed his mother and his sister his X-rays, and he announced his intention to sue the Department for excessive use of force during his arrest. Amaro did not pursue the emergency treatment that Dr. Green had recommended.

Three days later, on April 21, 2000, Amaro died in the basement of his friend Gilbert Becerra's home. Amaro had arrived at Becerra's home the night before complaining of severe pain caused by a police beating during a recent arrest. The autopsy report prepared by Dr. Van Meter on April 23

listed Amaro's cause of death as "bronchopneumonia[2] and hemothorax[3] due to multiple rib fractures due to blunt trauma to the chest."

Amaro's death was investigated by a team of Oakland homicide officers led by Sergeant Gus Galindo. By noon on the day Amaro died, Sergeant Galindo had inspected Becerra's basement and reviewed Amaro's March 23 arrest report, which did not mention any force used by the officers during the arrest. However, by 4:00 p.m. on the day of Amaro's death, Sergeant Galindo and his homicide investigators had: (1) spoken with Dr. Green, who told investigators that Amaro complained he was beaten by police during his arrest and had suffered broken ribs and a punctured lung; (2) spoken to the intake officer at the Oakland county jail who stated that Amaro had complained of rib pain and had facial injuries when booked on March 23; (3) reviewed the Oakland County Jail nurses' log which indicated Amaro had complained numerous times of rib pain and being hit by police; and (4) spoken to a non-arrestee witness of Amaro's March 23 arrest, Laureen White, who related she had seen police officers beating an individual matching Amaro's description.

Around 5:30 p.m. on the day Amaro died, Sergeant Galindo went to Amaro's residence to inform Amaro's parents that Amaro had died. According to Montoya (Amaro's mother), Sergeant Galindo told her that Amaro had "died in the street," the result of a gang dispute over drugs. Sergeant Galindo's statement was demonstrably false in at least one regard: Amaro's body was found in Becerra's basement, not in the street. Additionally, by the time he spoke to Montoya, Sergeant Galindo had already received information corroborating

---

[2]Bronchopneumonia is the acute inflamation of the walls of the airway branches in the lungs.

[3]Hemothorax is the collection of blood in the pleural cavity (the space between the chest wall and the lung).

Montoya's contention that Amaro had been beaten by the police; there was no evidence of a gang beating.

Despite Sergeant Galindo's misrepresentations, Montoya believed her son's contention that he had been beaten during his March 23 arrest, and suspected that Amaro died as a result of injuries suffered during the police beating. Thus, in the months following Amaro's death, Montoya attempted to gather evidence for a lawsuit against the Department for her son's wrongful death. In April and May 2000, Montoya put up posters throughout her neighborhood seeking information about Amaro's March 23 arrest. The posters stated that Amaro had been beaten by "6 task force officers," and that he had sustained numerous broken ribs as a result of the beating but had been refused medical attention while in jail.

On at least three occasions between April 2000 and October 2000, Montoya also requested copies of the police report for Amaro's March 23 arrest, as well as records related to Sergeant Galindo's homicide investigation into Amaro's April 21 death. Her requests were first denied on the basis that the matter was still "under investigation." However, the Department continued to deny Montoya's requests for the police reports even after Sergeant Galindo had completed his homicide investigation. The Department's stated reason for denying Montoya's request after Sergeant Galindo's investigation was complete was an outstanding arrest warrant for (the deceased) Amaro.

The Department also launched an Internal Affairs ("IA") investigation into the alleged use of force against Amaro during his March 23 arrest, and a purported post-arrest coverup by the officers involved. This investigation was completed in August 2000, and made the following findings:

> Jerry Amaro was severely injured during his arrest of 23 Mar '00. His five broken ribs were most likely a result of being forcibly taken to the sidewalk, but

there were at least five officers who used some form of physical prowess on the 140 pound Amaro. There is no documentation of any use of force in the [arrest] report. While the force used by the officers in this case was justified, there is no indication of any resistance on the part of Amaro or explanation for the use of force in the report. Unfortunately, this was not an anomaly for the operation that night. There is very little doubt Amaro was struck by officers during his arrest.

Additionally, the IA report found that the reporting officer had forged his supervisor's signature on the police report of Amaro's arrest, the use of force against Amaro was unacceptably left out of the police report, and the officers were "derelict" in not responding to Amaro's requests for medical treatment. Finally, the investigation concluded that Lieutenant Edward Poulson, the commanding officer of the reverse drug sting operation, inappropriately met with other officers prior to their interviews with IA investigators, and that his failure adequately to handle or document Amaro's complaint of pain could easily be considered contributory to his death. Despite her requests for police records related to Amaro's arrest and death, Montoya was never informed of the results of either the homicide or IA investigations.

At various points between May 2000 and September 2000 —within the statute of limitations period—Montoya also met with five different attorneys regarding representation for her potential wrongful death lawsuit against the Department. At the time of her attorney interviews, Montoya had not found any witnesses to her son's arrest, had been denied access to the police report for Amaro's March 23 arrest and the homicide/IA investigation reports, and had been told by Sergeant Galindo that Amaro was found dead in the street as a result of gang and drug activity. Based on this evidence, none of the five lawyers Montoya consulted—including John Burris, her counsel here—would take her case.

Nonetheless, on September 13, 2000, Burris helped Montoya file a *pro per* government claim for damages against the City of Oakland pursuant to Cal. Gov. Code § 910, alleging that the officers' use of excessive force during the March 23 arrest caused Amaro's death.[4] There is no record of any action having been taken by the City on this claim.

More that eight years later, in January 2009, the FBI received an anonymous tip that Poulson, the commanding officer of the reverse drug sting, had kicked Amaro repeatedly during his arrest and had covered it up by instructing subordinate officers to lie. The FBI launched a formal investigation into this allegation and other allegations of excessive force by Oakland police officers. Soon after, news reports surfaced detailing the force used against Amaro during his arrest and the true circumstances of his death, as well as the alleged coverup engineered by Poulson—who was suspended from his position as head of Internal Affairs at the Oakland Police Department. Based on this newly-revealed information, Montoya was able to secure counsel for the instant claim.

In March 2009, Montoya filed this 42 U.S.C. § 1983 suit against the City of Oakland in federal district court alleging

---

[4]Montoya's government claim alleges:

> This claim is based on the use of excessive force by officers of the Oakland Police Department against Jerry Andrew Amaro III during the course of his arrest on March 23, 2000. Mr. Amaro died as a result of the beating he received. The excessive force used by the police officers and their failure to provide adequate medical/emergency assistance to Jerry Andrew Amaro III during his arrest and subsequent custody at the Oakland City Jail, caused or substantially contributed to his death. The injuries of decedent were sustained in the vicinity of the 7200 block of Holly Street in Oakland.

> Mr. Amaro complained of pain when he was booked into jail but was not provided medical treatment. He was transferred to Santa Rita jail and released March 28. He died on April 21, 2000 as a result of the injuries sustained during his arrest.

that the police officers' excessive use of force during Amaro's arrest, and their subsequent denial of medical treatment, caused Amaro's death. The City moved to dismiss Montoya's § 1983 claim as time-barred under the applicable two-year statute of limitations. Judge Alsup, of the Northern District of California, denied the City's motion, finding that Montoya had shown "a plausible factual basis" for the argument that the City was equitably estopped from raising a statute of limitations defense because of its fraudulent concealment.

Discovery then proceeded on all issues, and the City moved for summary judgment on the same basis. The district court again denied the City's motion, holding that Montoya had raised a genuine issue of material fact as to the applicability of equitable estoppel, such that the issue should go to a jury. Judge Alsup found the issue suitable for an interlocutory appeal under 28 U.S.C. § 1292(b) and certified the following question: "Whether the doctrine of equitable estoppel should apply where a plaintiff believes she has a Section 1983 claim but is dissuaded from bringing the claim by affirmative misrepresentations and stonewalling by the police."

## Analysis

### I.  Equitable estoppel *does* apply where the plaintiff believes she has a cause of action but is "dissuaded" from bringing the claim because of defendant's affirmative misrepresentations and stonewalling within the limitations period.

**[1]** The doctrine of equitable estoppel, often referred to as fraudulent concealment, is based on the principle that a party "should not be allowed to benefit from its own wrongdoing." *Collins v. Gee West Seattle LLC*, 631 F.3d 1001, 1004 (9th Cir. 2011). The doctrine "focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit." *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir.

2000). In this circuit, the plaintiff carries the burden of pleading and proving the following elements of equitable estoppel:

> (1) knowledge of the true facts by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in that intent, (3) ignorance of the true facts by the relying party, and (4) detrimental reliance.

*Bolt v. United States*, 944 F.2d 603, 609 (9th Cir. 1991). Additionally, when estoppel is sought against the government, "there must be affirmative misconduct (not mere negligence) and a serious injustice outweighing the damage to the public interest of estopping the government." *Id.*

**[2]** The City contends that equitable estoppel does not apply to this case because Montoya thought she had a cause of action, and thus, cannot establish the third prong of the equitable estoppel test: ignorance of the true facts by the relying party. However, this court has held exactly the opposite. This court's precedent holds that a plaintiff can know, or suspect, that she has a cause of action and still be "ignorant of the true facts" of the case. Most directly, this court has held that equitable estoppel applies to bar a statute of limitations defense "when a plaintiff *who knows of his cause of action* reasonably relies on the defendant's statements or conduct in failing to bring suit." *Stitt v. Williams*, 919 F.2d 516, 522 (9th Cir. 1990) (emphasis added). Therefore, the focus of the equitable estoppel analysis is not whether the plaintiff *knew* she had a cause of action—or even pursued some other form of litigation based on that knowledge—but whether the defendant's fraudulent concealment or misrepresentation deprived the plaintiff of a full understanding of the true facts, and thus, dissuaded the plaintiff from filing the claim at issue within the limitations period.

The case which best draws the distinction between knowledge of a cause of action and knowledge of the true facts is

*UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir. 1994). In *Local 343*, defendant Elmar Lee Pettit appealed the district court's grant of summary judgment in favor of the plaintiff Union in the Union's suit against Pettit for running a "double-breasted" plumbing operation (running one union shop and a parallel non-union shop to circumvent the collective bargaining agreement). *Id.* at 1469. Union officers suspected Pettit of illegal double-breasting, but when confronted with their suspicions, Pettit lied and claimed that the second, non-union plumbing shop was owned by his wife. *Id.* at 1474. The Union nevertheless lodged an unfair labor practice charge with the NLRB based on its suspicions (the charge was later withdrawn when the NLRB threatened dismissal). *Id.* The Union later filed suit against Pettit alleging breach of the CBA; however, the suit was filed after expiration of the four-year limitations period, for breach of a written contract. Relevant here, the district court held that Pettit could not assert a statute of limitations defense to the Union's suit because he had fraudulently concealed the true facts of the case during the limitations period. This court affirmed, rejecting Pettit's contention that fraudulent concealment could not apply where the Union acted on its suspicions in filing a charge with the NLRB. *Id.* The court concluded: "[w]here a plaintiff suspects the truth but investigates unsuccessfully, fraudulent concealment will toll the statute [of limitations]." *Id.* at 1475.

**[3]** We find no basis for distinguishing the reasoning of *Local 343*, even though *Local 343* presents itself, at least nominally, as an equitable tolling case. *See id.* at 1474 ("We agree with the district court that the doctrine of equitable tolling applies here."). This court has held that, although the doctrines of equitable tolling and equitable estoppel are often confused, "the better reasoning states that equitable tolling applies when the plaintiff is unaware of his cause of action, while equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's statements or conduct in failing to bring suit." *See Stitt*, 919 F.2d at 522. As such, we believe the logic of *Local 343*—

where the Union strongly suspected it had a claim against Pettit, so much so that it filed a charge with the NLRB—can be extended to estop the City of Oakland from raising a statute of limitations defense to Montoya's § 1983 suit.

[4] Here, Montoya diligently investigated her son's arrest and death within the limitations period and believed she had a claim against the Department. However, five different lawyers told her that, in light of Amaro's uncorroborated statements about a police beating and Sergeant Galindo's (mis)statements regarding Amaro's death, Montoya did not have sufficient evidence to file a § 1983 claim. Instead, she filed a *pro per* government claim to put the City of Oakland on notice of her grievance, and thereby preserve her cause of action under California's Governmental Tort Action statute (Cal. Gov. Code. § 910). Although the language of Montoya's government claim reveals her suspicion—and subjective knowledge—that her son died as a result of a police beating, Sergeant Galindo's misrepresentations regarding the circumstances of Amaro's death and the Department's continued stonewalling in refusing her requests for Department reports prevented Montoya from appreciating the full nature of her claim and dissuaded her from filing a § 1983 claim. Just as the filing of an NLRB charge by the Union in *Local 343* did not preclude invocation of equitable estoppel by this court, the fact that Montoya expressed her suspicions in a § 910 Government Code claim does not bar application of the doctrine here. Therefore, we answer the district court's certified question in the affirmative: the doctrine of equitable estoppel *does* apply where a plaintiff believes she has a 42 U.S.C. § 1983 claim but is dissuaded from bringing the claim by affirmative misrepresentations and stonewalling by the police.[5]

---

[5]We do not address the district court's determination that there exist genuine issues of material fact as to the four constituent elements of equitable estoppel. That issue was not certified to this court and is not otherwise amenable to direct appeal. *See Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259, 1264 (9th Cir. 2010) ("[A] denial of summary judgment on the basis of an issue of material fact is ordinarily not a final judgment and not a basis for an interlocutory appeal." (citing *Johnson v. Jones*, 515 U.S. 304, 315-18 (1995)).

**AFFIRMED.**